## CLYBURN v. REYNOLDS.

1. After a lapse of twenty years, a newspaper citation to an absent defendant, signed by the proper officer, stating that it appeared to his satisfaction that such defendant was a non-resident, with the printer's mark indicating a publication for the required time, an order *pro confesso*, and a decree of the court passing upon the rights of such defendant, furnish sufficient proof of service as then required by statute, even though affidavits of non-residence and of the publication are not now to be found in the record.

2. As a general rule where the Court of Equity finds it necessary to take jurisdiction of a landed estate and to control and dispose of the fee, it may order a sale which will bar the rights of mere contingent remaindermen who have no present interest, and cannot therefore be made parties. And where a contingent remainderman as such was a party before the court in a cause for the distribution of the estate, he is bound by the decree, even as to property in which an interest became vested in him by a subsequent appointment under a power contained in the will of the testator, and which, in the absence of such appointment, would have vested in him and others as contingent remaindermen.

3. In an action for the settlement and distribution of an estate among the devisees and legatees, to which the executor and two creditors were made parties, but creditors as a class were not made parties, the decree of the court is binding upon all the parties to the cause, but not upon the creditors generally. *Doubted*, whether creditors, with a full remedy in hand, could be compelled to come in as parties to an action between devisees and legatees for the settlement of a solvent estate and to determine their interests under the will and the order and proportions in which the debts should be paid by them.

4. An order for sale of portions of the real estate of testator for the purpose of raising funds with which to pay his debts was within the gen-

eral scope of a bill by an executor which prayed "that by orders herein, arrangements may be made to pay the debts, \* \* but if this cannot be promptly effected, he asks the aid of the court herein."

5. An order within the scope of the pleadings, made in open court and unappealed from, is binding upon all parties to the cause ; and the fact that some of the parties endorsed their consent to such an order, and thereby made it their agreement, does not render the order invalid as to those not consenting.

6. It is not a proper practice to order sales to be made by a trustee who is before the court, or by one who is not the proper officer of the court, but where sales are ordered to be made by the executor, and no appeal is taken from such order, sales made thereunder are valid. Receivers may be appointed by the court to make sales under its orders, even though the bill contained no prayer for the appointment of a receiver.

7. Parties interested, as creditors or legatees, in the proceeds of sales made under orders in a cause to which they were parties, cannot, where such proceeds were amply sufficient to pay their claims, ask that other portions of the estate be subjected to the payment of these claims. If these proceeds were not properly applied, it is their own fault.

8. Under the terms of the will in question, and the law of the land, the assets of the estate should be applied in the following order to the debts of testator : (1) Money due on credits charged by testator with the payment of debts. (2) General residuary personal estate. (3) Rents, income, and proceeds of sale from certain designated realty. (4) Specific legacies, and devises whether specific or residuary.

9. Where a building, insured by a life-tenant, is destroyed by fire, the insurance money, if not expended in rebuilding on the property held for life, passes to the remainderman, the life-tenant taking the interest thereon during his life-time.

Before WITHERSPOON, J.; Kershaw, September, 1887.

Mr. Justice McIver being within the prohibited degrees of consanguinity to one of the parties in interest, Hon. Thomas B. Fraser, Judge of the Third Circuit, sat in his place.

The appeal was from the following decree :

The cause came on to be heard upon the pleadings, the several reports of the master, and the exceptions to said reports on behalf of the defendants, (1) David R. Williams, (2) the children and grandchildren of John Chesnut, and (3) the legal representative of Mary B. Chesnut, now deceased. No issue is raised *by the pleadings* as to the liability of any of the other legatees or

devisees under the will of James Chesnut, the elder, to contribute to the payment of debts, or as between themselves. The only questions now before the court are those raised by the exceptions of the defendants above named relating to their liability to contribute to the payment of the debts of James Chesnut, the elder, as reported by the master. As the court is not informed as to the amount or the source from which the funds in the hands of the present receiver have been derived, it might be regarded as *premature* to consider the issues raised by the exceptions to the master's report. No objections having been urged on this ground, the points raised by the exceptions will be considered.

It is clear that if the debts of James Chesnut, the elder, could not otherwise be paid, the legacies should have first been exhausted before resorting to lands specifically devised. This, however, has not been done, and it remains to be determined under the exceptions whether the master erred in concluding that the creditors of James Chesnut, the elder, can now resort for the payment of their debts to the devised land in the possession of the defendant, David R. Williams, and the legacy of $16,000 bequeathed to the children and grandchildren of John Chesnut. I understood it to be conceded by counsel in the argument that the large balances reported by the master to be due by James Chesnut, as *executor* and as *receiver*, could not be made available for the payment of the debts of James Chesnut, the elder, reported by the master.

The first exception of the defendant, David R. Williams, alleges that the master erred in holding that said defendant had been made a party to, and was bound by, all orders made under the original bill, filed April 23, 1867, as aforesaid. I concur with the master in concluding that David R. Williams was made a party to the original bill. It appears that David R. Williams, as a *legatee* under the will of James Chesnut, the elder, was made a party defendant to said bill by publication, and that a decree *pro confesso* was taken against him according to the practice then prevailing in the Court of Equity in this State. As a party to said bill, David R. Williams is bound by all orders made by the court in said cause, *within the scope of said bill.* There is, however, no allegation by the executor in the original bill that

would indicate a necessity for the sale of lands specifically devised to pay testator's debts. I do not think such a result was contemplated under the original bill. While I concur with the master in concluding that the order of court, under which portions of the "Mulberry and Sandy Hill" plantations were sold to pay debts, are binding upon the defendant, David R. Williams, *as appointee* under the will of James Chesnut, the younger, yet said defendant is not thereby precluded from showing that the portion of said lands in his possession are not liable for the debts of James Chesnut, the elder.

The second exception of the defendant, David R. Williams, alleges that the master erred in concluding that the debts of James Chesnut, the elder, were not barred by the statute of limitations. The statute could not apply to the two judgment debts, and even if it could, I concur with the master, that the payments made by the executor would prevent the operation of the statute as a bar to any of the debts reported by the master.

The third exception of the defendant, David R. Williams, alleges that the master erred in failing to find and report, that if the debts of James Chesnut, the elder, have not been paid, it was owing to the negligence of the creditors. The question of *negligence* raised by the exceptions becomes important, in view of the fact that the creditors were instrumental in bringing into court and in placing in the hands of receivers, without requiring security, an *ample fund* to pay their debts, which fund has been lost. There can be no doubt that the fund brought into court at the instance of the creditors was amply sufficient to pay all of the debts of James Chesnut, and that the debts reported by the master would have been paid if the creditors had exercised *proper diligence* in having the fund in court applied to their debts. Under these circumstances, as between the creditors and the legatees and devisees, now called upon to contribute, the debts should be regarded *as paid.* But if this view is not correct, it seems to me clear that the creditors would not be entitled to further *interest* on their demands, after the receivers, under the order of court, had realized funds enough to pay their debts.

Have the creditors been guilty of negligence in collecting their debts, as alleged in the exceptions? The executor, in the origi-

nal bill, filed in 1867, represented the debts of testator at about $20,000. Under orders for sales to pay debts in 1869, and under subsequent orders consented to by the creditors, it appears by the master's report that the executor and receivers have realized from the sales of land nearly $50,000. The master reports that on August 15, 1884, the receivers were indebted to the estate in the sum of $20,806.40, not taking into consideration the large amount reported then to be due by the *executor*. The long delay and failure on the part of the creditors now before the court to collect their debts, whilst this large fund was in the hands of the receivers for that purpose, seem to be inexcusable. After being instrumental in having the larger portion of this valuable real estate of James Chesnut, the elder, sold and the proceeds brought into court to pay debts, the creditors for ten or twelve years have permitted the fund to remain in the hands of the receivers, without calling the executor or receivers to account, or applying to the courts to have their debts paid. As between the creditors guilty of such great negligence, and the legatees and devisees, it seems to me that in equity the creditors should suffer the consequences of such neglect, rather than to require additional burdens to be imposed upon the legatees and devisees to pay said debts. I find as matter of fact and conclude as matter of law that the creditors of James Chesnut, the elder, now before the court, have been guilty of such negligence and *laches*, as will in equity exempt the land in the possession of the defendant, David R. Williams, as *appointee* under the will of James Chesnut, the younger, from liability to pay the debts of James Chesnut, the elder.

As to the $16,000 legacy bequeathed to the children and grandchildren of John Chesnut: I do not think that the plaintiff in the supplemental complaint, as the successor of James Chesnut, executor, in the absence of any allegation of mistake or fraud, can call upon the legatees to account for so much of the $16,000 legacy as has been paid them by James Chesnut, executor. It is not clear that the creditors even would be entitled to personal judgment against said legatees to recover the amounts paid them by James Chesnut, executor, at this late date. I do not think that the payment of the $16,000 legacy has been

charged upon the devised real estate as contended in argument, Under the 5th clause of testator's will it seems to me that testator has already manifested his intention to exonerate the specifically devised land by providing what seemed to testator to be ample means for the payment of his debts and legacies out of the income from his several large and valuable plantations, upon which were employed some four hundred slaves at the time of the execution of testator's will. Hence, in the 5th clause testator directs that the whole of his planting interest shall remain and be used and employed by his executors to pay his debts.

The exceptions to the master's report upon the part of the children and grandchildren of John Chesnut, ordinarily might be regarded as too vague and indefinite to entitle said parties to the relief that has been adjudged to the defendant, David R. Williams, in consequence of the fund provided to pay debts, and the *negligence* of the creditors. But the grounds upon which David R. Williams has been adjudged to be entitled to relief as against the creditors, rest upon facts appearing from the record before me, which seem to me to be sufficient to entitle the parties interested in the $16,000 legacy to the same relief without formal exceptions. In this view, and for the reasons assigned above, in considering the third exception of the defendant, David R. Williams, I find as matter of fact and conclude as matter of law, that the legacy of $16,000, bequeathed by James Chesnut, the elder, to the children and grandchildren of John Chesnut, is not liable to the payment of testator's debts, as reported by the master.

I do not deem it necessary to add anything to the full and satisfactory report of the master with reference to the $2,250 funds in the hands of the receiver, realized upon a policy of fire insurance. The exceptions to the report of the master with reference to said insurance fund of $2,250, are overruled, and said report is hereby confirmed and made the judgment of this court.

In holding that the defendant, David R. Williams, and the defendants interested in the $16,000 legacy, are not liable to contribute to the payment of the debts of James Chesnut, the elder, upon the ground that said debts as to said parties are to be regarded as paid, it is not intended to adjudge that any funds now in the hands of the receiver realized from sales of land

for the payment of debts under orders of court, consented to by the devisees, cannot be applied to said debts.

It is ordered, adjudged, and decreed, that the several reports of the master herein referred to, except as overruled or modified by this decree, be confirmed and made the judgment of this court. It is further ordered and adjudged, that the receiver of the estate of James Chesnut, the elder, do apply the funds in his hands or that may come into his hands, that have not been derived from the sale of land specifically devised, as follows : 1. To the payment of the costs of the proceedings under the original bill, filed April 23, 1867, and the supplemental complaint herein, to be taxed by the clerk of this court. 2. To the payment of the judgments reported due by the master, not, however, including interest on said judgments after a sufficient amount was realized by the receivers under orders of court to pay said judgments. 3. To the balance of the $12,000 legacy reported as due, and charged as a debt, with interest only as directed with reference to the judgments. 4. The balance of funds in the hands of the receiver, if any, to be held subject to the further order of court. Should the funds in the hands of the master, to be applied as directed, be found insufficient to pay the costs and debts as above directed, the master will apply so much of the proceeds of the land specifically devised, in his hands, as may be necessary to pay the costs, and debts as above directed, and hold the balance, if any, of the proceeds of land specifically devised subject to the further order of court.

The plaintiff, Mrs. Reynolds, and others, appealed on the following grounds :

I. That his honor erred in holding that David R. Williams is in possession of the unsold portion of the lands devised to James Chesnut, jr., and holds the same as appointee under the will of said James Chesnut, sr. II. That his honor errs in holding that no issue is raised by the pleadings as to the liability of the legatees and devisees under the will of James Chesnut, the elder, to contribute to the payment of debts as between themselves. III. That his honor errs in holding David R. Williams not precluded from showing that the portion of said lands in his possession are

not liable for the debts of James Chesnut, the elder. IV. That his honor errs in holding that the creditors were instrumental in bringing into court and in placing in the hands of the receivers, without requiring security, an ample fund to pay their debts. V. That his honor errs in holding that said funds would not have been lost if creditors had exercised proper diligence, and on this ground their debts should be regarded as paid as to devisees and legatees. VI. That his honor errs in holding that the creditors are not entitled to interest on their demands after the time at which receivers were in funds sufficient for their payment. VII. That his honor errs in finding as matter of fact, and concluding as matter of law, that the creditors of James Chesnut, the elder, now before the court, have been guilty of negligence and *laches.* VIII. That his honor errs in finding as matter of fact, and concluding as matter of law, that the legacy of sixteen thousand dollars ($16,000) is not liable to the payment of testator's debts. IX. That his honor errs in assuming that any portion of the devised lands or of the $16,000 legacy sought to be subjected to the payment of debts, had ever been turned over to the devisees or legatees. X. That his honor errs in holding that the testator had not subjected his land, as well as his personal estate, to the payment of his debts. XI. That his honor errs in overlooking the fact that the lands of the estate had been directed by the testator to be held, and under the orders of the court had been practically held, to be turned over to the devisees only after the payment of all debts. XII. That his honor erred in failing and refusing to order the lands now held by David R. Williams, as appointee under the will of James Chesnut, the younger, to be turned over to the receiver of the estate of James Chesnut, the elder.

David R. Williams appealed on the following grounds:

1. Because his honor erred in holding that the orders of court under which portions of the Mulberry and Sandy Hill plantations were sold to pay debts, are binding upon the said defendant as the appointee of James Chesnut, the elder. 2. Because his honor erred in holding that the said orders are in any part binding upon said defendant, inasmuch as the same are not within the scope of the original bill under which said sales were made. 3.

Because his honor erred in holding that the said orders are in any part binding upon the said defendant, inasmuch as the same were consent orders to which the defendant was not a party.    4. Because his honor erred in holding that the said defendant was made a party to the original bill.    5. Because his honor erred in not holding that the said defendant is entitled to the possession of the Mulberry and Sandy Hill plantations, as the same existed at the time of the death of the testator, James Chesnut, the elder, and as the same were devised by him in his will, in their entirety, notwithstanding any sale or sales, deed or deeds of conveyance of any part or parts thereof, made under said consent orders of court, to which the said defendant was not a party in any character, and could not have been made a party in his character as appointee, as aforesaid.    6. Because his honor should have ordered and decreed, as requested by said defendant. that he, the said defendant, should have the right, and be authorized to elect to confirm the said sales and conveyances, and have the fee simple value of so much and of such part or parts of the Mulberry and Sandy Hill plantations as have been sold and conveyed by and with the consent of the parties who are entitled under the will of the said James Chesnut, the elder, to the said two-thirds fee simple value of the said plantation, set off and deducted from the said two-thirds fee simple value of the same, and applied to the discharge of the incumbrance of the said charge upon the said plantation.    7. Because his honor erred in not holding that, as to this defendant, as appointee under the will of the testator, James Chesnut, the elder, all of the debts of the said James Chesnut are barred by the statute and presumption of payment.    8. Because his honor erred in overruling the exceptions of the said defendant to the report of the master with reference to the insurance fund of $2,250.

The issue of John Chesnut appealed on the grounds:

1st. Because his honor, after holding in said decree that the legacy of $16,000, left these defendants by testator in his will, was not liable for the payment of his debts or legacies, directed that the funds now in the hands of the receiver, or that shall come into his hands from other sources than devised real estate,

shall be applied to the costs of suit and the payment of the debts, &c., of testator as therein directed. 2nd. Because his honor did not find as matter of fact and conclude as matter of law, that said legacy of $16,000 had been paid to and was held by James Chesnut, the executor, as trustee for the children and grandchildren of John Chesnut, deceased, and was, therefore, not liable to the payment of testator's debts and legacies. 3rd. From so much of said decree as holds, that said debts and legacies are not charged upon or payable out of the real estate devised, when the payment of said debts and legacies is made a condition precedent to said devisees being let into the possession and enjoyment of their devises. 4th. The defendant, Amelia Chesnut, wife of James Chesnut, and Ellen Chesnut, wife of Thomas W. Chesnut, and Amelia Taylor, *née* Haile, except to and appeal from so much of said decree as holds that those interested in the legacy of $12,000 given by testator to his wife Mary, are confined to look for payment only to so much of the funds raised by order of court for the payment of debts as remain in the hands of the receivers ; and to so much of said decree as deprives them of interest due subsequent to said funds being raised in the hands of said receivers.

Mr. and Mrs. Frierson appealed on the grounds :

1. Because his honor erred in holding that the Mulberry and Sandy Hill lands, and the $16,000 legacy to the children and grandchildren of John Chesnut, are not liable to contribute ratably to payment of debts, and towards bearing burdens of the estate. 2. Because his honor erred in holding that those portions of Mulberry and Sandy Hill, which, by prior orders of court, were ordered to be sold, and which are now unsold and in possession of D. R. Williams, are not now still subject to sale under those orders, for the purposes therein intended. ·

*Messrs. J. T. Hay* and *R. W. Boyd*, for plaintiffs and others.

*Messrs. Edward McCrady, jr.*, and *W. E. Trantham*, for D. R. Williams.

*Messr. Lyles & Haynsworth*, for issue of John Chesnut.

*Messrs. T. J. Kirkland, C. L. Winkler,* and *W. M. Shannon,* for other parties.

July 8, 1889.   The opinion of the court was delivered by

MR. JUSTICE FRASER.   James Chesnut, the elder, styled in his last will and testament, under which this litigation has arisen, "James Chesnut, of Mulberry," died February 17, 1866, having executed his said will February 16, 1864.   By this will James Chesnut, jr., his son, and David R. Williams, a grandson, were appointed executors, and Mrs. Mary Chesnut, his wife, was appointed executrix thereof.   Mrs. Mary Chesnut, his wife, predeceased him, leaving a last will and testament, duly executed, dated March 11, 1848, one codicil dated July 27, 1853, and one dated      day of      , 1858, and of which James Chesnut, the elder, her husband, and James Chesnut, jr., her son, were appointed executors.   James Chesnut, jr., became the sole qualified executor of the will of James Chesnut, the elder, and also of the will of Mrs. Mary Chesnut, both of which were duly admitted to probate.

By the will of James Chesnut, the elder, a legacy of $12,000, and regarded by the testator as a debt due by him in consideration of some property of his wife which had come to his hands, and in lieu of dower, was given to his wife, and in case she should predecease him the said legacy was made subject to such disposition as she might make by will, or instrument in the nature of a will.   The property of James Chesnut, the elder, consisted of large sums due him and other assets, but mainly of estates in lands and slaves (some 400 in number), with such live stock, provisions, and other personal property as were necessary and proper for the successful management of such estates.   The will was long and complicated in its provisions, and was rendered especially difficult of administration in consequence of the fact that, between the time when the will was executed and the death of the testator, the emancipation of the slaves had taken place, and the scheme of the will had thereby become impracticable.

It became necessary to invoke the aid of the courts to adjust the rights of the parties to the new state of things growing out of this loss of property in the slaves, the insolvency of persons who

were largely indebted to the testator, and whose fortunes had also perished in the general derangement of values which followed the civil war. On February 23, 1867, a bill in equity was filed by James Chesnut, jr., the executor, in which all the parties then in being, who were then, by any possibility, interested under the provisions of this will, were named as parties defendant. Two creditors were also named as parties defendant, to wit. Lynch H. Deas, in his own right, and William Wallace, as administrator of William C. Workman. The purpose for which they were brought in will be hereafter stated.

The testator, so far as will be necessary to state here, devised and bequeathed as follows: (1) two tracts of land on "Jumping Gully Creek" to his executors and executrix in trust for his two daughters, Mary C. Reynolds and Sarah Chesnut, and his two granddaughters, Mary C. Grant and Harriet S. C. Grant. (2) A parcel of land known as "Bloomsbury" to his daughter, Sarah Chesnut. (3) A tract of land known as "Sanders Creek" to his grandson, John Chesnut. (4a) To his wife, Mary Chesnut, for life, four (4) plantations—"Belmont and Town Creek" and "Mulberry and Sandy Hill"—with the slaves, live stock, provisions, and so forth, on them, and called his "planting interest." (b) He charged on the income of said "planting interest" certain annuities or annual payments in favor of Mary C. Reynolds, Sarah Chesnut, his two daughters, and Mary C. Grant and Harriet S. C. Grant, two granddaughters, and also provided as follows: "Should my wife die before my debts [including therein the legacy of $12,000 to her and the interest thereon] shall have been fully paid and satisfied, it is my will and desire, and I devise accordingly, that my whole 'planting interest' shall remain in the hands of my executors to be used and employed by them for the satisfaction of said debts and legacy." (c) Subject to this provision he devised the plantations known as "Belmont and Town Creek" to his two daughters, Mary C. Reynolds and Sarah Chesnut, and to his two granddaughters, Mary C. Grant and Harriet S. C. Grant, under certain trusts, and with remainders over. (d) Subject to the same provision he gave to his son, James Chesnut, jr., for life, the plantation known as "Mulberry and Sandy Hill," and at his death to his issue, and in default of

issue, subject to his appointment by will in favor of one of the male descendants of the testator, and, in default of such appointment, then to the children and grandchildren of testator then living. There is also a power of appointment in the twentieth clause of the will confined to one of the testator's "grandsons bearing the name of Chesnut," and to which we will hereafter refer. (5) Testator in his will gave to the children of a deceased son, John Chesnut, a "bond" of James Chesnut, jr., for $16,000, secured by a mortgage of "The Hermitage, Camden Mills, and Pinetree plantations," which he had conveyed to his said son, James Chesnut, jr., in his life-time. (6) Testator directs that certain interests in lands in Pennsylvania be sold, and the proceeds divided among his children and grandchildren. (7) There are sundry small specific and pecuniary legacies to different persons of not much importance (8) Testator gives a legacy of $5,000 to his grandchildren, Mary S. C. Witherspoon and David R. Williams, to be paid out of debts due testator in the West. (9) Testator. directs that all money due to him on account of debts due at his death be applied to the payment of his debts, and then to the payment of the legacy of $12,000, if not otherwise fully satisfied. (10) Testator, by the tenth clause of his will, gives all other tracts of land, not hereinbefore specifically devised, to his son, James Chesnut, jr., and his heirs. (11) And in the thirty-third clause of the will he gives all the rest and residue of his estate, real and personal, to his children and grandchildren therein named. This brief statement of the provisions of the will is perhaps sufficient for the present purpose.

The specific purpose for which Deas and Wallace, the two creditors, were made parties, was to have an adjudication of the value of their claims in good money, they having been created during the war, and in consideration, as alleged, of 4 per cent. certificates borrowed by testator for the payment of taxes. They were not called in as representatives of a class, as is usually done in a bill to marshal the assets of an estate which is insolvent. Other creditors were not called in, and the bill expressly states that there is "no ground upon which to invoke the restraining process of this court, as the estate is abundantly good for all liabilities of testator." It appears that the claim of Deas has not been

paid, but the claim of Wallace seems to have been paid, as no mention is made of it in the reports of the master.

It appears from an examination of the bill that its scope and purpose were: (1) To determine the value in good money of the claims of Deas and Wallace, administrators, two creditors who were made defendants; (2) to obtain an order of the court for leave to carry out a proposed compromise of a large debt due by parties residing in Mississippi; (3) to obtain a construction of the court of the power of appointments given in the sixth and twentieth clauses of the will; (4) to subject the choses in action, stocks, &c., and the Mississippi lands (to be taken under the proposed compromise for the Mississippi debts) to the payment of the debts, and the legacy of $12,000, and for an order for the sale of these assets, as well as the residuary estate for this purpose; (5) to have an order for the partition of Belmont and Town Creek plantations; (6) for general relief. The nature of this general relief is indicated in the bill in these words: "If the estate has longer to be kept together to meet the debts of the testator, your orator well hopes that by orders herein arrangements may be made to pay the debts, and to assign and allot to each the portions assigned them in the will; but if this cannot be promptly effected, he asks the aid of the court herein." Sarah Chesnut, Mary C. Reynolds, and her daughters, Mary R. DeSaussure, Emma C. Reynolds, Ellen C. Reynolds, Sally Reynolds, and Esther S. Reynolds, James J. Frierson, and Mary C., his wife, Harriet C. Stockton and her child, Lucian W. Stockton, and Lynch H. Deas appeared and answered the bill. The bill was taken *pro confesso* against all the other defendants.

No one has called in question, in this appeal, the regularity of this order *pro confesso* except David R. Williams, who takes the ground that he has never been properly made a party, either as one of the devisees under the will or as appointee under the power given in the will to James Chesnut, jr.

The case came before Chancellor W. D. Johnson for a hearing, and he rendered a decree in the cause, dated March 6, 1868. Of this decree it is only necessary here to say that the construction put by it on the power of appointments was the one followed by James Chesnut, jr., in executing that power in favor of David

R. Williams, one of the "male descendants" of the testator, and that by it a writ of partition was ordered to be issued, in accordance with the prayer of the bill, to divide "Belmont and Town Creek plantations" among the parties entitled thereto under the will, subject, however, to any claims of the creditors of James Chesnut, the elder, that may not be satisfied out of the portions of the estate first chargeable with debts, and to such contributions among devisees and legatees as may be necessary to meet deficiencies towards paying debts and other charges.

To the writ thus issued a return was made by the commissioners in partition recommending a sale, which by law was one of the exigencies of a writ of partition. Upon this return an order was made by Judge Boozer, dated September 22, 1869, confirming the return, and directing a sale. By this same order James Chesnut, jr., and William M. Shannon were appointed receivers, and without sureties, and they were authorized to make the sales, and were directed, after the payment of certain costs and fees, to hold the balance of the purchase money and securities taken, subject to their due proportion of the debts of the testator and to the further order of the court. Large sales were made by the receivers under this order, to which reference will be made hereafter.

On January 20, 1871, an order was made by Judge Melton for the sale of 2,663½ acres of "Mulberry." On October 2, 1872, an order was made by Judge Melton for the sale of 601½ acres of "Mulberry." Both of these orders for the sale of portions of Mulberry directed the sales to be made by James Chesnut, executor, and he was directed to hold the proceeds "subject to the *pro rata* share of debts and legacies chargeable upon them." These orders were made on motion of the attorney of James Chesnut, jr., executor, and with the consent of "J. B. Kershaw, defendants' solicitor," and "J. M. Davis, defendants' solicitor." We think the only proper inference is that they were the attorneys or solicitors for all of the defendants who had answered, but for none of those who had not answered, and as to whom there was entered an order *pro confesso.* What is called "Mulberry" in these orders seems to have meant portions of Mulberry and Sandy Hill, which were sold under these orders. Large portions

of Mulberry and Sandy Hill were sold by James Chesnut, jr., under these orders, to which we will hereafter refer.

It will be noticed that under all of these orders for sale of the four plantations, the court, at the suggestion and on motion of eminent counsel, seems to have guarded the interests of creditors, and seems to have regarded the proceeding as one in which their rights were involved, even though not made parties, having before the court the executor who was trustee for the creditors first, and whose interest it was his duty to protect, even against the legatees and devisees.

The case, about 1870, was dropped from the calendar. On December 12, 1883, a notice was served on Mary C. Reynolds, Sarah Chesnut, Mary R. DeSaussure, Emma C. Reynolds, Ellen C. DeSaussure, Esther S. Davis, Mary S. C. Witherspoon, David R. Williams, Thomas W. Chesnut, James Chesnut, Serena Haile, Mary C. Frierson, and Harriet C. Stockton of a motion (1) to restore the case to the calendar; (2) to provide for the sale of those portions of "Mulberry and Sandy Hill" not sold under previous orders; to substitute the proceeds for the land so sold; to provide for the life estate of James Chesnut, jr., and for the interest of those in remainder in the lands so sold, or in the fund so substituted for them; (3) to provide for contribution among those interested to pay legacies and other charges, so as to equalize payments made and to be made; (4) to provide for a final settlement of the estate of the testator. On February 8, 1884, an order of reference was made in pursuance of this notice looking to an accounting by James Chesnut, executor and receiver, William M. Shannon having died, and to a final settlement of the estate.

By some order, not in the "Case," P. H. Nelson had been appointed receiver, and the master, by a report dated September 15, 1885, recommended a sale of (1) "Indian Mound or Taylor's Field" and a "Sandy-hill tract," containing 17.7 acres, which were lands passing under the residuary clauses of the will; (2) of all or a portion of the "Hermitage lands," being land conveyed to James Chesnut, jr., by his father, James Chesnut, the elder, in his life-time, and covered by a mortgage to secure the bond of $16,000, and given by the will to the children of John

Chesnut, deceased.  An order for the sale of these lands was made by Judge Hudson, dated September 16, 1885.  James Chesnut, jr., the executor, had died February 1, 1885, and when this order was made it does not appear that any one had been made a party to the cause, representing the estate of James Chesnut, the elder, James Chesnut, jr., or any one as heir of James Chesnut, jr.  Reference will hereafter be made to the sales made under this order.

James Chesnut, jr., the executor, and life tenant of "Mulberry and Sandy Hill," by a last will and testament, under the power given to him in the sixth clause of the will of James Chesnut, the elder, appointed David R. Williams, one of the "male descendants" of James Chesnut, the elder, there being a default of issue of the said James Chesnut, jr., to take and hold the said "Mulberry and Sandy Hill plantations."

Stephen C. Clyburn has been appointed administrator *de bonis non cum testamento annexo* of the estate of James Chesnut, the elder.  In August, 1886, he filed a supplemental complaint, in which all the parties made defendants in the original complaint were made defendants, and also Mrs. Mary B. Chesnut, who is the only new party, and made such as the widow of James Chesnut, jr.  The appointment, by the will of James Chesnut, jr., in favor of David R. Williams is set out in this supplementary complaint, and he is made a party defendant in this new relation as appointee.  The prayer of the supplemental complaint is for judgment (1) that the "Mulberry and Sandy Hill" plantations, appointed by the will of James Chesnut, jr., under the power to David R. Williams, be adjudged liable for their proper proportions of the debts of James Chesnut, the elder; (2) that the defendants, the descendants of John Chesnut, may be adjudged to account for any portions of the $16,000 legacy paid to them, and that the sums already paid, and any balance not yet paid, be adjudged liable for the payment of debts in exoneration of the real estate; (3) for the relief demanded in the original complaint, and for any further relief proper in the cause.

Harriet C. Stockton, Lucian W. Stockton, James Frierson and Mary, his wife, answered this supplemental complaint, joining in the prayer thereof.  The descendants of John Chesnut who are

interested in the $16,000 legacy (1) deny their liability to account for what has been paid them on this account, or to contribute out of that legacy to the payment of debts in exoneration of the realty. (2) They deny that the power of appointment under the will of James Chesnut, the elder, was properly exercised in favor of David R. Williams, and claim that the power could have been exercised only in favor of a grandson bearing the name of Chesnut, as provided in the twentieth clause of the will. (3) They claim payment of any unpaid portions of the $12,000 legacy under the joint wills of James Chesnut, the elder, and Mary Chesnut, his wife

David R. Williams has answered, claiming (1) that he holds "Mulberry and Sandy Hill" under a valid execution of the power; - (2) that he was never properly made a party defendant to the original bill of complaint filed in 1867, in any capacity; and if it should be held by the court that he was properly made a party defendant in any capacity, (3) that he was not made a party in his new capacity and relation as appointee under the power, the appointment not having been made; (4) that therefore he is not bound by any of the orders heretofore made, or transactions under them, especially such as are outside of the scope of the bill; (5) that there was ample personal estate to pay the debts and legacy of $12,000, and that he is in no way responsible for the appropriation of the proceeds of portions of "Mulberry and Sandy Hill" to the payment of the debts and this legacy of $12,000; (6) that, while not bound by the sales made under these orders of portions of "Mulberry and Sandy Hill," he would elect to confirm such sales if the court would charge such of the children and grandchildren of testator who consented to these orders, and who, under the will, are entitled to be paid by the appointee under the power the full two-thirds value of these plantations, not including the value of the residences, with the amount of sales made; (7) that there was abundant real and personal estate applicable to the payment of the debts and this $12,000 legacy; and (8) that all such debts and such portions of said $12,000 legacy as may not have been paid, are barred by the statute of limitations, and as to them he sets up also the presumption of payment from the lapse of 20 years, and the *laches* of the said

creditors and legatees in neglecting to realize their claims out of funds applicable to and provided for their payment.

On February 10, 1886, a petition in the cause was filed by Mrs. Mary B. Chesnut, widow of James Chesnut, jr., in which it was stated that a short time before his death James Chesnut, jr., took out a policy of insurance in the Home Insurance Company, of New York, on the residence on Sandy Hill for the sum of $2,250; that the policy was taken out by mistake in the name of James Chesnut, as executor; that the residence was destroyed by fire in his life-time, and proof of loss was made out before his death; that questions having arisen as to who was entitled to the said money, it was paid to P. H. Nelson, receiver, and is now in his hands, subject to the order of the court; that the said policy should have been in the name of James Chesnut as an individual, as the same was intended for his own benefit. She therefore claimed that the money should be paid to the administrator of James Chesnut, jr., in order that the same may be applied to the payment of his debts, she holding a large claim against his estate by judgment. Mrs. Mary B. Chesnut has since died, and David R. Williams, jr., her administrator, has been substituted as a party in her place in this cause.

There are several elaborate reports of the master, covering the issues raised in the original bill, in the supplemental complaint, and in this petition, in reference to the insurance money. These reports bear date respectively January 16, 1885, September 1, 1887, September 3, 1887, and August 29, 1887; the latter being the report in reference to the insurance money. All these reports came up before Judge Witherspoon on exceptions, and a judgment was rendered by him bearing date February 15, 1888. It is on exceptions to this judgment that the cause is now before this court on appeal. It will not be necessary to take up these exceptions *seriatim*, but we will take up in order the questions raised by them.

The points adjudicated by the judgment of the Circuit Court will be better understood by the statement of a few facts which appear in the "Case":

There was realized from the sale by W. M. Shannon
   and James Chesnut, jr., receivers of portions of
   Belmont,                                          $13,416 90
From sale of portions of Town Creek by them,         19,576 84
From sales of reserved lands (portions, we take it, of
   Belmont and Town Creek) by them,                   1,880 00

          Total,                                     $34,873 74
From sales of Sandy Hill and portions of
   Mulberry by James Chesnut, executor, $ 3,937 23
From sales of Mulberry,                  10,803 55

          Total,                                      14,740 78

          Total from sales of real estate,           $49,714 52

Total not accounted for from Belmont and Town
   Creek,                                            $13,982 43
Total not accounted for from the reserved lands,      1,880 00

          Total,                                     $15,862 43
Total not accounted for from Mulberry and Sandy
   Hill,                                              6,886 96

          Total unaccounted for,                     $22,749 39

Total of payments from Belmont and Town Creek,       $19,011 31
Total of payments from Mulberry and Sandy Hill,       7,853 82

          Total of payments,                         $26,865 13

There is nothing in the "Case" to show what has been collected
or paid out from the choses-in-action and the residuary personal
estate; the unsatisfactory condition of the accounts of the execu-
tor and the receivers being perhaps due to the death of Mr.
Shannon and the loss of a book in which he kept the accounts of
the estate. These reports of the master show that on August
15, 1884, a short time before the death of James Chesnut, jr.,
the executor, there remained as outstanding claims:

| | |
|---|---|
| Judgment of W. A. Ancrum, obtained in 1867, | $   780 86 |
| Judgment of L. H. Deas, obtained in 1869, | 1.117 11 |
| On legacy of $12.000 to Mary Witherspoon, | 973 57 |
| "    "    "    "    " Sarah Chesnut, | 2,516 46 |
| "    "    "    "    " Minnie L. Deas, | 443 80 |
| "    "    "    "    " Amelia Chesnut, | 67 45 |
| "    "    "    "    " Ellen Chesnut, | 67 45 |
| "    "    "    "    " Amelia Taylor, | 523 14 |
| Total, | $6,489 84 |

The claim of William Wallace, administrator, does not appear in the list, and must have been paid. W. A. Ancrum, one of the judgment creditors, has never in any way been made a party to this cause, and he cannot be bound by any order herein. He must proceed as he may be advised. It does not appear that any of the proceeds of the sales made by the receivers above referred to, or by James Chesnut, jr., executor, are within the reach of the court; but if there are any such, they are applicable to these claims in their proper order. The judgment from which this appeal is taken has made no order in reference thereto.

The following is an approximate statement of the funds now in the hands of P. H. Nelson, receiver, and of the sources from which they are derived:

| | |
|---|---|
| Insurance money | $2.250 00 |
| Hermitage lands, | 2,450 00 |
| Rents of Hermitage and Town Creek. | 1,082 00 |
| "Indian Mound" or "Taylor's Field" paid on debts of L. H. Deas and W. A. Ancrum, without prejudice to the rights of parties to this action, | 840 00 |
| | $6,622 00 |

The exceptions to the judgment of the Circuit Court, in which the views of the master were in part adopted, raise questions as to the principles on which this estate must be settled, which, after proper inquiry, may be hereafter applied, unless this court concurs in the view taken by the Circuit Judge.

The first, and perhaps the most important, question which

meets us is as to the effect of the previous orders in the case, and the transactions under them, upon David R. Williams as one of the legatees under the will, or in his new relation as appointee of James Chesnut under the power given to him in the will.   No other party has called in question the validity of these orders except David R. Williams, unless it be the descendants of John Chesnut, and they only question the construction given by Chancellor Johnson to the power of appointment, which was adopted by James Chesnut, jr., and under which David R. Williams claims as appointee.

As to the order *pro confesso* against David R. Williams as an absent defendant.   There is in the record no affidavit. as required by the act then in force, that David R. Williams and others did not reside in the State, and there is no affidavit that the order of publication was inserted in a newspaper the requisite number of times.   We find, however, an "order of publication clipped from the paper in which it was published at the time, and appears pasted in a book in the office of the commissioner in equity."   This printed order was signed by the commissioner, "J. D. Dunlap, C. E. K. D."   These parties are required in the order to appear, &c., within 40 days.   This order has on it the printer's private mark to show how long it was ordered to be published—"td," till day—and in it is recited the fact that it appeared to the satisfaction of the commissioner that David R. Williams and others are without, and reside beyond, the limits of the State. Then follows without date, but in the usual form, the order *pro confesso*.   Nearly 12 months after the date of the *sub. ad res.*, the decree of Chancellor Johnson, above referred to, was rendered.

It must be remembered that this record is now an old one— over 20 years—and that it has run the gauntlet of the reconstruction period in this State.   It is held in Illinois that if substantial service by publication or otherwise appears, and the court rendering the judgment declared the proof of regularity sufficient, the existence of incidental facts may be presumed to aid its jurisdiction.   *Secrist* v. *Green,* 3 Wall., 751.   It is not necessary here to go to the extent of this ruling, because we think that the fragmentary evidence before us points almost conclusively to the existence of the affidavits which were necessary in the case, and

certainly nothing to the contrary appears in the record. It would be very dangerous, after such lapse of time, to hold that the mere absence from the record of affidavits usually written on loose sheets of paper should render invalid proceedings under which important rights have been adjudicated and valuable titles been acquired. We therefore hold that the order *pro confesso* against David R. Williams was properly taken, and that he and all the other defendants in the same situation are bound by all orders properly taken within the scope of the bill.

Now, what was the scope and purpose of this bill? If it had been a bill to call in the creditors and marshal the assets of the estate as well in the interests of the creditors as of the devisees and legatees, there could be no doubt that the court would have a right to bar the rights of all parties interested in the estate, and who are properly made parties. The claims of creditors are paramount to all others. We hold that the general doctrine is that whenever the Court of Equity finds it necessary to take jurisdiction of an estate in lands, and when it becomes necessary to control and dispose of the fee, it has the right, by a sale for this purpose, to bar the rights of all mere contingent remaindermen who have no present interests, and cannot be therefore made parties. *Williman* v. *Holmes*, 4 Rich. Eq., 475 ; *Farr* v. *Gilreath*, 23 S. C., 502. This last case was only for the change of investment, and the trustee and life tenant alone were made parties, and the court held contingent remaindermen bound by the orders for sale made in the case.

If there had been a failure of issue of James Chesnut, jr., as there was, and a failure to make an appointment by James Chesnut by will, "Mulberry and Sandy Hill" would have gone to the children and grandchildren of testator then living, clearly giving them contingent remainders. The appointee stands in the same position in reference to this property as he would have done if he had taken it as one of the children and grandchildren then living, except that he takes the whole property subject to the charge. "Immediately upon the execution of such a power the estates created in default of appointment cease and are defeated, and the estates limited under the power take effect from the time of the execution of the power in the same manner as if they had

been contained in the deed creating the power." 2 *Sugd. Pow.*, 33, § 2. While, therefore, it is true that, as laid down in *Fraser & Dill* v. *Charleston*, 13 S. C., 533, a party to an action can be bound by the judgment of the court only in that capacity in which he has been impleaded, there is no reason why, in a proper case, a contingent remainderman, or, as here, the appointee of a power given on a contingency, may not be bound by the orders and judgment of the court where he has not been, and even could not have been, made a party.

The creditors, as a class, were not called in as parties to this bill, and as such they are not bound by the orders made therein, except such as were made parties. The executor is trustee first for the creditors, and then for the devisees and legatees. The creditors could have reached the property of the estate by suits at law against the executor alone, or, as our courts are now organized, by an action on the law side of the Common Pleas. If this had been a case in which the estate was insolvent, and the creditors, as a class, had been called in, as well as those defendants who were interested as devisees and legatees under the will, there can be no doubt that sales made would have been binding on all who were interested in the estate, whether for life or in remainder, vested or contingent, or under a power of appointment not then executed and dependent on some contingency which might never happen.

It may be doubted, and this seems to have been the theory on which the bill was framed, whether, in case of a solvent estate as this was, the creditors could have been compelled, with a full remedy in their hands, to come in as parties to a litigation between the devisees and legatees as to the order and proportions in which they should contribute to the payment of the debts, and as to the relative rank of their respective interests under the will. A partition of "Belmont and Town Creek" was prayed for in the bill, and this carried with it, as a necessary incident, a prayer for a sale of the lands if the same could not be divided without injury to the parties. The proceedings under this bill from the beginning, so far as the orders of the court were concerned, were taken with a special reference to the rights of creditors, in whose interest the executor was before the court; the proceeds of every sale

having been charged with the *pro rata* share of the debts, of which the $12,000 legacy was one, having been put by the testator in his will on the same footing as a debt, at least so far as the devisees and legatees are concerned. The same remark applies to all the sales made of "Belmont and Town Creek" and of "Mulberry and Sandy Hill." All persons interested in "Belmont and Town Creek," then in being, answered the bill, and are bound by the sales made, and do not now call them in question.

We concur in the construction of the will as to the power of appointment given in the decree of Chancellor Johnson, which has not been appealed from. We therefore hold that David R. Williams is entitled to hold as appointee under the power given to James Chesnut, jr., but for the reasons above given we do not think that he has any right to set aside the sales of "Mulberry and Sandy Hill," made under the orders in this case, and that these orders are within the general scope of the bill, "that by orders herein arrangements may be made to pay the debts, * * * but if this cannot be promptly effected, he asks the aid of the court herein," and which seems to have been the view acted on by the distinguished counsel in the case and adopted by the court.

It is true that these orders for sale are by agreement or consent of parties who had answered, and by their solicitors, no other persons being bound by the consent, while by this consent parties were cut off from the rights of appeal from these orders. If they were made in open court, and were within the scope of the pleadings, they are in all respects binding as orders or judgments, if not appealed from; all parties who have been served and made parties being presumably for all purposes covered by the pleadings present in court, and bound by what is done. The fact that some of the parties to an action consent to an order or a judgment in open court does not render them invalid as to those who do not consent, unless, in proper time, as was done in the case of *Hand* v. *Railroad Co.* (10 S. C., 406), an appeal is taken, and the order or judgment set aside as to the parties who do not consent, on good and sufficient grounds other than the want of "consent."

. The sales of "Belmont and Town Creek" were made by William M. Shannon and James Chesnut, jr., who were appointed

receivers for this purpose. The bill did not pray for the appointment of receivers, but the appointment was not void for this reason. "A receiver may be appointed at the final hearing, even though the bill contain no prayer for such relief." *High on Receivers*, § 83. The sales of "Mulberry and Sandy Hill" were made under the orders of the court by James Chesnut, jr., as executor, and not as receiver. It has been the practice, perhaps one not to be commended, to require the party before the court, holding the property under some trust, to make such sales. It may be that on appeal it might have been held that such an order was irregular, and that the sale should have been made by an officer of the courts, or it may be that James Chesnut, jr., would have been held, in effect, a receiver. However this may be, it is now too late to disturb these sales on this account; there having been no appeal, and valuable rights acquired under them.

If, then, these orders, and the sales under them of portions of "Belmont and Town Creek" and "Mulberry and Sandy Hill," are valid, it is too late now for any of the parties to this proceeding, who are interested in the proceeds of such sales for the payment of their debts and legacy, and which proceeds were largely in excess of their claims, to demand that any other portions of the estate, real or personal, shall be subjected to their payment, or to call for any other contributions for their benefit. They have had the prior claim on those proceeds which have been provided at the expense of other parties, and within the control of the court. If these proceeds can be reached, they can have the orders of the court to do so, and if they cannot be reached, it is their own fault that they have been allowed to pass out of their reach, and it is not just that they be allowed to levy further contributions for their benefit. They should have seen to it that these proceeds should have been properly applied.

If more of "Mulberry and Sandy Hill" has been sold than was sufficient to pay their *pro rata* share of the debts and legacy, and the fund has been lost, all of these parties, including David R. Williams, the appointee, must bear their proportions of the loss. Those who were in court, and consented by their solicitors to these orders of sale, did not thereby warrant to the appointee or to each other that the fund arising from the sales would be pro-

perly accounted for and applied. We therefore hold that David R. Williams, the appointee, who is in possession of the unsold portions of "Mulberry and Sandy Hill," is entitled to hold such unsold portions, subject to the payment of the two-thirds value of such unsold portions, not including the value of the residences thereon, to the children and grandchildren living at the death of James Chesnut, jr., in the proportions prescribed in the will of testator.

If the sales already made of portions of these four plantations have not been sufficient to pay the debts which may still be valid claims, it may become necessary to resort to other portions of the estate for this purpose, and certain funds now in the hands of the receiver or to come into his hands, have been ordered in the judgment appealed from, except "those derived from the sale of lands specifically devised," to be paid (1) to costs; (2) to the two judgments referred to; (3) to balance of legacy of $12,000, without interest, after the receivers were in funds to pay them. It is necessary, therefore, under the exceptions to consider the order of liability of different portions of the estate. The "Hermitage" lands were conveyed by testator to his son, James Chesnut, jr., and the bond for $16,000, secured by the mortgage of "Hermitage" and other lands, is clearly a specific legacy. 1 *Wms. Ex'rs*, 845. "Indian Mound" or "Taylor's Field" passed either to James Chesnut, jr., under the tenth clause of the will, or to the children and grandchildren under the thirty-third clause, and as to which parties have not been heard.

Now, the order of liability of the assets in this case, not referring to classes which are not represented here, so far as we know, is as follows: (1) Money received on debts due to the testator at his death, and charged therewith in the twenty-ninth clause of the will; (2) the general residuary personal estate; (3) the rents, if any, or other income from "Belmont and Town Creek," "Mulberry and Sandy Hill," and the proceeds of the sales of any portions of these plantations heretofore sold, or hereafter to be sold, if any debts should appear, which have not been paid, and not barred by lapse of time or otherwise; (4) specific legacies, and lands whether devised in terms specific or residuary, *pro rata*. This is intended as the order only as to the assets which seem to

be within the purview of this case.  See *Warley* v. *Warley*, Bail. Eq., 397 ; *Jarm. Wills*, 449, 450.  The money on hand from sale or rents of "Hermitage" is clearly not liable until the previous classes have been exhausted.  The rents from "Town Creek" are liable in the third class above.

The only other question which remains is as to the insurance money, $2,250, now in the hands of the receiver, P. H. Nelson, and which has been subjected to the payments ordered by the Circuit Judge.  James Chesnut, jr., had carried for several years a policy of insurance on the residence on "Sandy Hill Plantation."  The policy had expired ; and a short time before his death, and while he was in very feeble health, the policy was renewed in the name of James Chesnut, executor.  It is not clear whether he intended to have the policy in his own name or as executor, and in the view we take it is not important.  It is not well settled in this country as to how far a tenant for life is responsible to the remainderman for "accidental fires."  4 *Kent,* 82.  A sum of money paid to the guardian of an infant tenant in tail for rebuilding a copy-hold tenement that had been burnt was held to belong to the remainderman.  The personal representative of the infant being entitled to the interest as compensation for rents and profits, copy-hold tenants were liable for waste unless by the act of God.  *Rook* v. *Warth*, 1 Ves., Sr., 461, 462. In case of a total loss by fire the fund arising from general insurance is substituted for the destroyed property, and the life tenant will be entitled to the interest for life, and the remainderman to the principal.  *Haxhall's Ex'rs* v. *Shippen*, 10 Leigh., 536 ; *Graham v. Roberts*, 8 Ired. Eq., 99.

In the case of *Annely* v. *DeSaussure* (26 S. C., 505), an insurance policy taken out by one tenant in common was held not to inure to the benefit of the co-tenant.  One tenant in common is not in any sense a trustee for his co-tenant, and has no insurable interest in his share of the property.  A life tenant, on the other hand, is a trustee for the remainderman, and is certainly liable for loss by fire caused by his negligence.  He ought not to be allowed to put himself in a position in which he would have no motive for proper care of the estate by having a policy of fire insurance by which, in case of loss, he could substitute the full

fee simple value of the buildings in place of his interest for life. We therefore think that a sound public policy requires that any money collected by a life tenant on a total loss by fire should be used in rebuilding, or should go to the remainderman, reserving the interest for life for the life tenant.

We quote as appropriate the language from 4 *Wait Act. & Def.*, 22, in reference to insurance beyond the value of interest of the insured: "And where the insurance is beyond the amount of the interest at stake, the effect is the same; for, although the amount of the loss only can be properly recovered, there will be a hope of getting more." It would be in the nature of "gambling." In accord with these views is the case of *Parry* v. *Ashley*, 3 Sim., 97, and our own case of *Bath Paper Co.* v. *Langley*, 23 S. C., 129, in which the court uses these words: "If * * * the defendants stood in the relation of *quasi* trustees towards the plaintiffs, then the money received by them for the insurance on the house of the plaintiffs belonged *ex æquo et bono* to the plaintiffs." With these views of this case we hold that the insurance money now in the hands of the receiver belongs to David R. Williams, and that he is not liable to account for it in estimating the two-thirds value of Sandy Hill in his settlement with the other children and grandchildren of testator, but liable for its *pro rata* share of any valid debts, according to the above views, yet to be paid out of the estate.

It is therefore ordered that the judgment of the Circuit Court be reversed so far as inconsistent with the principles herein announced, and that the case be remanded to the Circuit Court for such further proceedings as may be necessary and proper to carry out the views herein expressed, and as may be necessary to adjust the rights of the parties, under the principles herein set forth.[1]

---

[1] This completes the cases of November Term, 1888.—REPORTER.